UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------- X
MULLER BOAT WORKS, INC.,

                         Plaintiff,

    -against-                              **MEMORANDUM & OPINION**
                                           05-CV-04531 (KAM)
UNNAMED 52' HOUSE BARGE, her
generators, tackle and appurtenances,
*in rem*, and MICHAEL LESSER, and EVE
FISCHER, *in personam*,

                         Defendants.
-------------------------------------- X
MATSUMOTO, United States Magistrate Judge:

         The parties in this case consented to a trial before

the undersigned, pursuant to 28 U.S.C. § 636(c) (<u>see</u> doc. no. 3),

and a bench trial was conducted on February 8-9, 2006.[1]  After

reviewing the submissions of the parties and having assessed the

credibility of the witnesses, the Court makes the following

findings of fact and conclusions of law as required by Rule 52 of

the Federal Rules of Civil Procedure.  For the reasons set forth

below, plaintiff is awarded $17,127.40 in damages, and defendants

are awarded $72,056.79 in damages, without costs, plus

prejudgment interest as calculated in accordance with this order,

and post-judgment interest as provided by law.


## I.  PARTIES AND CLAIMS

         Plaintiff Muller Boat Works, Inc. ("plaintiff") filed

_____

         [1] Trial exhibits are designated as "Pl. Ex." and "Defs. Ex."

-1-

this action against Michael Lesser ("Lesser") and Eve Fischer ("Fisher") (collectively, "defendants"), the owners of a vessel, *in personam*, and an Unnamed 52' House Barge, her generators, tackle and appurtenances, *in rem* (the "vessel"). Plaintiff claims that defendants refused to pay an amount due and owing on an oral contract with plaintiff for repair services that plaintiff claims to have completed, and for which plaintiff has not yet been compensated. (<u>See</u> Doc. No. 10, Joint Pretrial Order ("JPO") ¶ 4(a).) Plaintiff seeks $35,778.73, representing the unpaid invoice for work allegedly performed by plaintiff between December 14, 2004 and April 28, 2005, labor undertaken, materials supplied, sales taxes, and storage and provision of electricity to the vessel for the period of May 11, 2005 through August 30, 2005. (<u>Id.</u> ¶ 4(a).)

Defendants answered and filed a counterclaim alleging "poor workmanship and negligence" in plaintiff's repair and care of the vessel while the vessel was in plaintiff's custody. (Doc. No. 6, Answer ¶ 18.) Specifically, defendants allege that while working on the roof of the vessel, plaintiff caused the interior of the vessel to be exposed to rain and snow, and that plaintiff permitted the vessel's pipes to freeze and rupture, all of which resulted in extensive water damage. (<u>Id.</u> ¶ 4(b).) Defendants seek $81,869.29 in damages, representing the cost of labor and materials incurred as of the date of the trial, the estimated

cost of future repairs, and storage and towing costs, plus interests and costs of this action. (<u>See generally</u>, Doc. No. 11, Statement of Damages.)

## II.  FINDINGS OF FACT

Plaintiff is a corporation organized and existing under the laws of the State of New York with its principal place of business located at 2214 East 69th Street, Brooklyn, New York. (<u>See</u> JPO ¶ 7.3.)  Its president and forty percent shareholder is James Muller ("Muller").  (Transcript of Bench Trial on Feb. 8-9, 2006 ("Tr.") at 4.)  Plaintiff performs repairs, modifications and alterations to boats measuring 40' to 130' in length, and weighing less than 300 tons, and has eight full-time employees. Plaintiff does not routinely service house barges.  (<u>See</u> JPO ¶ 7.4.)

The defendant vessel is an unnamed 52', multi-level house barge built in 1987.  (<u>See generally</u> Pl. Ex. 1, Olsen Marine Surveyors Co., Survey Report dated Nov. 3, 2004 (the "Olsen survey").)  The vessel has no steering apparatus or propulsion machinery onboard.  (<u>Id.</u> at 2.)  Defendants Lesser and Fischer purchased the vessel (<u>see</u> JPO ¶ 7.2.) on or about November 26, 2004 (Defs. Ex. J, Closing Statement; <u>see also</u> Tr. at 77-78).  Defendants purchased the vessel, believing it was an affordable alternative to a more traditional residence, with the

intention of making it their permanent residence.  (Tr. 66.)

Prior to purchasing the vessel, defendants inspected the vessel on several occasions, accompanied by William Vilkelis, a yacht broker familiar with the vessel and the sale of house barges.  (Tr. 156-59.)  Following the inspections, defendants made an offer to purchase the vessel, contingent upon a survey, and paid a deposit for the purchase price.  Defendant Fischer retained Captain Henry Olsen of Olsen Marine Surveyors Company ("Captain Olsen") to survey the vessel.  Ms. Fischer had retained Captain Olsen previously to survey a different barge.  (Tr. 72.)

On or about October 28, 2004, while the vessel was still at a marina occupied by its then owners, Captain Olsen surveyed the vessel, accompanied by defendant Lesser.  (Tr. 107-108.)  Captain Olsen issued a report of the survey on November 3, 2004.  (See generally Pl. Ex. 1, Olsen survey.)  The Olsen survey indicates that the:

> [p]urpose of this general inspection is to ascertain and otherwise determine this unit's general condition and value for purchase . . . .  No testing of any sort was carried out.  As vessel is presently occupied by ownership, systems are on line for the most part and examination of conditions shall be related herein.

(Id. at 1.)  The Olsen survey recommended certain repairs and modifications, among other things, including:  "repair [roof] approximate midship location, evidence of leak . . . should be fully restored[;]" (id. at 6), caulking of seam at port side roof attachment; correct electrical systems by adding electric meter

-4-

and approved shore receptacle to provide power to the vessel (<u>id.</u> at 3); converting propane heating system to heating oil system for safety reasons (<u>id.</u> at 5); installing approved sanitation system; and inspecting and correcting electrical wiring throughout the vessel. Captain Olsen valued the vessel at $75,000 to $80,000. (<u>Id.</u> at 6.)

Notwithstanding the need for repairs and modifications (the "work"), Captain Olsen did not recommend to defendants that they decline to purchase the vessel. Instead, Captain Olsen advised that should defendants "go forward with the purchase of [the vessel], that it would be wise to consult with a shipyard that is capable of doing this type of work . . . ." (Tr. 61.) When asked by Ms. Fischer whether he could estimate the cost of the work, Captain Olsen indicated that he could not, and advised Ms. Fischer that she should consult with a shipyard regarding the cost of the work. Captain Olsen suggested that Ms. Fischer contact Mr. Muller. (Tr. 73.)

On or about November 1, 2004, Ms. Fischer, upon the recommendation of Captain Olsen, telephoned Mr. Muller regarding the work to be performed on the vessel, as specified by Captain Olsen's survey of the vessel. (Tr. 73-74.) Ms. Fischer gave Mr. Muller a copy of the Olsen survey (Tr. 30), and Mr. Muller inspected the vessel (Tr. 7). Following their initial meeting, Ms. Fischer advised Mr. Muller that defendants' budget for the

work was "$20,000, and that was all we had . . . .   I was very emphatic about it because that was really all we had, and I wanted him to know that if it was going to be more than that, that we wouldn't be able to buy the boat . . . ."  (Tr. 74.)  Ms. Fischer further told Mr. Muller that she required an estimate that was "very precise and . . . generous . . ., allowing for unforeseen problems that might occur," given defendants' limited budget, and the need to factor the cost of repairs into defendants' decision whether to purchase the vessel.  (Tr. 74.)

On November 10, 2004, following his inspection of the vessel, Mr. Muller made handwritten notes of the items inspected, and told Ms. Fisher that he estimated the cost of the work set forth in the Olsen survey to be between $20,000 to $22,000.  (Tr. 10, 75-76; Defs. Ex. D, handwritten notes of James Muller dated Nov. 10, 2004.)  Mr. Muller's handwritten notes correspond to the work noted in the Olsen survey.  The final page of Mr. Muller's notes, entitled "Master Sheet," enumerates each repair and modification, and lists the estimated cost of each item of work. The estimate totals $21,700.75.  Mr. Muller reviewed each item of work and the estimated cost with Ms. Fisher on the telephone and he conveyed the total estimated amount to her.  (Tr. 79-80.)  It was defendants' understanding that all of the work in the survey, including the hauling of the vessel, was factored into Mr. Muller's estimate, and would not exceed $22,000.  (Tr. 76-77.)

Following receipt of Mr. Muller's estimate, defendants purchased the vessel on November 26, 2004, and had it hauled to plaintiff's shipyard.

The next day, defendants met with Mr. Muller to discuss the work required by the Olsen survey and plaintiff's estimated cost for completing those repairs. Defendants were advised that the repairs would be completed by the spring of 2005. (<u>See</u> Tr. 93.) Mr. Muller testified that he advised defendants that they would be charged $60 per hour for labor (Tr. 11-12), however, defendants dispute ever having been so advised (Tr. 80, 137). The Court finds that the parties agreed that plaintiff would perform the work set forth in the Olsen survey at the estimated price of between $20,000 and $22,000, and credits Ms. Fischer's testimony that the parties had not reached an agreement that labor would be charged at $60 per hour.

According to plaintiff's sole invoice dated August 25, 2005, plaintiff commenced work on the vessel on December 21, 2004, following the vessel's arrival at plaintiff's shipyard. (Defs. Ex. E, Muller Boats Works Invoice dated Aug. 26, 2005 ("Invoice").) Plaintiff maintained time records, by employee, of the work performed on the vessel, materials used, and hours of labor expended. (Defs. Ex. U, Time Records.)

It is undisputed that, following a discussion in August 2005 between Mr. Muller and Mr. Lesser regarding plaintiff's

-7-

invoice, defendants removed the vessel from plaintiff's shipyard without plaintiff's consent.  (Tr. 130, 136-137.)  Mr. Muller testified that he understood that the removal of the vessel from his custody divested plaintiff of a security interest in the vessel.  (See Tr. 209-210.)

## A.  Roof Repairs

Plaintiff's invoice, dated August 25, 2005, notes that eight months earlier, on December 22, 2004, plaintiff's inspection of the interior of the vessel's stateroom "found interior . . . extremely wet," and the mattress "saturated." (Invoice at 1.)  Defendants dispute the presence of moisture in the stateroom on December 22, 2004, and claim that various inspections of the vessel, including those by the vessel's broker, Mr. Vilkelis, and by Captain Olsen, only revealed a leak from the skylight above the staircase leading to the stateroom. At trial, Mr. Muller conceded that plaintiff's employees' time records do not reflect that the stateroom or mattress was wet. (Tr. 36.)  Nor is there any contemporaneous recording as of December 22, 2004, of the presence of moisture in the stateroom to the degree claimed by plaintiff.  Defendant Lesser testified that when he inspected the stateroom of the vessel at some point between December 22 and 25, 2004, there was no sign of water leakage.  (Tr. 110-111.)

The Court finds that the presence of moisture in the stateroom to the degree claimed by plaintiff is not consistent with the weight of the evidence in the record. For example, Mr. Vilkelis, the broker who facilitated the sale of the vessel, testified that he inspected the vessel not more than six times. (Tr. 159.) On his first visit, in the summer of 2004, Mr. Vilkelis inspected and photographed the vessel, and subsequently re-inspected it with defendants on the day of the closing. Mr. Vilkelis credibly testified that he did not observe any moisture or signs thereof in the stateroom during his inspections. The photographs taken by Mr. Vilkelis during his inspection of the vessel, admitted into evidence as defendants' exhibits G1-G5, confirm that the stateroom appeared dry. (See Defs. Exs. G1-G5; see also Tr. 157-59.)

Mr. Vilkelis did, however, find evidence of moisture originating from the skylight above the staircase leading to the stateroom. Following a rain storm, Mr. Vilkelis noticed a "slow drip" over the staircase leading to the stateroom, but not above the mattress. (Tr. 157-58.) Other than this leak, Mr. Vilkelis stated that the stateroom was "pretty dry." (Tr. 158.) He further noted that two people and their pets resided in the vessel at the time of the inspections. (Tr. 158.)

Captain Olsen's survey and testimony also noted the existence of a leak from the skylight above the staircase leading

to the stateroom, and also noted that a roof patch above the stateroom (the "forward roof") required repair. The Olsen survey does not note the presence of moisture in the stateroom to the degree claimed by plaintiff.

Due to the alleged wetness in the stateroom, Mr. Muller determined that the roof above that room, the forward roof, was rotten and, therefore, on December 22, 2004, commenced repairing the forward roof. Although Mr. Muller's estimate for the work included repairing the roof patch on the forward roof (<u>see</u> Defs. Ex. D, Handwritten notes of James Muller dated Nov. 10, 2004), his estimate did not include the cost of repairing that roof (Tr. 18). The Court credits Ms. Fischer's testimony that, before commencing the roof repairs, Mr. Muller did not tell her that the roof repair was not included in the estimate, nor discuss the extent of the repairs with defendants (Tr. 79-81), even though defendants had communicated to Mr. Muller their budgetary constraints, and despite the fact that the specific repairs to the roof were not indicated in the Olsen survey.

When repairing the roof, plaintiff first removed the protective fiberglass coating from the roof. (Tr. 37; Invoice entry at 12/22/04.) That fiberglass coating, Mr. Muller concedes, was in place to maintain the "water tight integrity of the roof . . . ." (<u>See</u> Tr. 37.) According to Mr. Muller, while removing this fiberglass coating, plaintiff's employees

discovered rotten wood underneath the fiberglass coating. It is undisputed that the rotten wood was removed, as discovered, piece by piece, after plaintiff's employees removed the protective fiberglass coating. (Tr. 38; <u>see also</u> Invoice entries at 12/22/04, 12/28/04-12/29/04.) It is also undisputed that approximately 66 square feet of the wood under the fiberglass coating was removed, and that the exposed portion of the roof was covered by tarpaulins. (<u>Id.</u>; <u>see also</u> Invoice entry at 4/6/05.) It is further undisputed that the tarpaulins often did not withstand stormy weather, and that due to winter weather conditions, plaintiff did not continue to repair the roof between January 11 and February 8, 2005. (Tr. 38-39; <u>see</u> Invoice entry at 1/11/05.) Plaintiff's invoice confirms that the tarpaulins were constantly replaced and adjusted due to weather conditions. (<u>See, e.g.</u>, Invoice entries at 2/3, 2/8-2/9, 2/15, 2/23/05.) Plaintiff's invoice indicates that plaintiff charged $13,440 for labor in connection with repairing the roof above the stateroom, including labor required to cover the exposed vessel with tarpaulins. (<u>See</u> Invoice entries at 12/22-23, 12/28/04, 12/29/04, 1/3/05, 1/4/05, 1/7/05, 1/10/05, 1/11/05, 2/3/05, 2/8/05, 2/9/05, 2/15/05, 2/16/05, 2/23/05, 4/6/05 and 4/18/05.)

Defendants claim that as a result of the water entry into the vessel after plaintiff opened the roof, the vessel required substantial additional repairs, specifically, to the

vessel's ceiling, floors and walls, which were cracked and water damaged. (See Tr. 89-91, 122; Defs. Exs. O, S1-S12.) Mr. Muller acknowledged that photographs of the vessel, admitted into evidence as defendants' exhibits P and Q, depict the condition of the stateroom on or about February 22, 2005 and March 28, 2005, after plaintiff opened the roof. The photographs show a film of water on the floor and buckets partially filled with water, which were placed by Mr. Lesser to catch incoming rain. (Tr. 39-40, 112-113; Defs. Exs. P, Q.) Defendants contend that the repairs to the roof were performed in an "unworkman-like and negligent manner," causing damage for which plaintiff should compensate defendants. (See JPO at § 4(b).) Defendants claim that the forward roof above the stateroom still leaked after it was allegedly repaired by plaintiff. (Tr. 98.) When Ms. Fischer informed Mr. Muller that the roof was still leaking in April 2005, Mr. Muller told her to hire her own contractor.[2] (Tr. 98.)

At trial, defendants presented the testimony of Jason Davey, a contractor, who was retained by defendants to perform certain repairs on the vessel. Mr. Davey, a carpenter with ten years of experience, testified that he began working on the

_____

[2] Mr. Muller advised defendants that the roof repairs were "way more than anybody anticipated" and that defendants "would be better off trying to find . . . someone cheaper to work on the inside of the [vessel] . . . ." (Tr. 23-24.) Defendants characterize this statement as Mr. Muller "washing his hands of the job even though it wasn't finished . . . . " (Tr. 98.)

vessel in early April 2005 while the vessel remained at plaintiff's shipyard. (Tr. 144.) Mr. Davey testified that he first began working on the forward roof above the stateroom, which is the portion of the roof allegedly repaired by plaintiff. (See Tr. 144-45.) Mr. Davey further testified that the roof appeared to have recently been worked on. (Tr. 145.)

The Court credits Mr. Davey's testimony that when he and his assistant first commenced work on the forward roof, portions of the roof were still rotten and soft, and that Mr. Davey's assistant almost fell through the roof. (Tr. 145.) The Court also credits the testimony of Mr. Davey and Ms. Fischer concerning Mr. Davey's repairs to the roof, specifically, that Mr. Davey and his assistant resheathed the roof by giving it a new layer of plywood, and covering the roof with a protective rubber membrane. (Tr. 146.) Mr. Davey and his assistant were able to resheath the roof above the stateroom in approximately three to four days, working eight hours per day,[3] at a cost of less than $3,000, inclusive of labor and materials. (Tr. 85-86; 145-48.) The Court also credits Ms. Fisher's testimony that, following Mr. Davey's work on the forward roof, the roof no longer leaked.

---

[3] Mr. Davey's assistant worked two of those days. (Tr. 86.)

**B.  Ruptured Piping**

Defendants further contend that plaintiff was negligent by permitting the vessel's water pipes to freeze and rupture while the vessel was in plaintiff's custody.  (JPO ¶ 4(b).)  At the time the vessel arrived at plaintiff's shipyard, Mr. Muller knew that the vessel had a toilet, shower, sauna, hot tub, sinks and piping to carry fresh water.  (Tr. 43-44.)  Mr. Muller testified that freezing weather between December and March in New York is not unusual, and that pipes carrying fresh water could "positively" freeze and rupture.  (Tr. 44.)  Despite his awareness of the likelihood that pipes carrying fresh water throughout the vessel could freeze during the winter months, Mr. Muller testified that he did not take any measures to prevent the pipes from freezing and rupturing, nor advise defendants of this possibility.  (Tr. 44.)  Notably, plaintiff's estimate reflects that it anticipated repairs to the vessel's piping and plumbing systems, as necessary to repair the vessel's heating and sanitation systems and the hot tub.  (See generally Defs. Ex. D.)

The Court finds that the vessel's pipes froze and ruptured, damaging the piping system, plumbing facilities, fixtures serviced by pipes, and insulation and walls in which the piping was enclosed.  The Court further finds that the aforementioned damages to the pipes and plumbing occurred while the vessel was in plaintiff's custody, and as a direct result of

plaintiff's failure to protect the pipes from freezing by arranging for the introduction of antifreeze into the plumbing system. The Court bases its findings, *inter alia*, on the testimony of Christos Gotsis, an expert witness in the field of general contracting, who inspected the vessel in late November or early December, 2005. (See Tr. 186.) Mr. Gotsis had been contacted by defendants to provide an estimate on the cost of repairing the vessel's electrical, heating and plumbing systems, walls, and ceilings. Mr. Gotsis credibly testified that when he inspected the vessel, he observed ruptured pipes, wet insulation, damaged plumbing fixtures, and damaged walls, and ceilings.

Mr. Gotsis testified that the pipes ruptured due to freezing, ruling out any other possibilities, and that the ruptured pipes damaged the plumbing system, fixtures serviced by pipes, the water heater, walls, ceiling, and floors. (Tr. 187-89.) He also opined that this damage was easily preventable by retaining a plumber to introduce antifreeze into the plumbing system at a cost of $300 to $400. (Tr. 190-91.) This antifreeze would run through the heating system, and not affect the pipes circulating potable water throughout the vessel. (Tr. 191.)

The Court finds that the extensive damage resulting from the ruptured piping was not present when the vessel was sold to defendants and delivered to plaintiff. Specifically, photographs of the vessel taken in the summer of 2004, the fact

that two individuals and their pets resided in the vessel until
its sale to defendants, and the testimony of defendants, Captain
Olsen, and Mr. Vilkelis who inspected the vessel approximately
six times, belie any suggestion that this damage preexisted the
sale of the vessel to defendants.  In so finding, the Court is
mindful that the Olsen survey noted the presence of mold,
detritus, and other debris in some areas of the 18-year-old
vessel.  Nevertheless, the extent of the damage observed by Mr.
Gotsis in late November or early December 2005, (Tr. 186),
compared to the evidence in the record regarding the condition of
the vessel at the time of its sale to defendants and arrival at
plaintiff's shipyard a year earlier, supports the determination
that the vessel was extensively damaged while in plaintiff's
custody.

   At trial, defendants presented evidence, uncontested by
plaintiff that, as of the date of the trial, defendants had
expended $34,126.79[4] in labor and materials to repair the roof,
the damage caused by the entry of water into the vessel from
plaintiff's failed roof repair, and the extensive water damage
resulting from the ruptured pipes.  (Tr. 89-91, 94; Defs. Ex. O,
Receipts.)  The Court finds that defendants expended $34,126.79

---

   [4] This sum includes the $4,500 sought for Ms. Fischer's
labor from April 2005 to August 2005 (18 weeks), at approximately
25 hours per week, at a rate of $10 per hour.  (See Tr. 94;
Statement of Damages.)

in repairing the damage caused by the ruptured piping and water damage as of the date of the trial.

In addition, Mr. Gotsis's estimate for remaining future repairs of the damage to the plumbing system that resulted from the freezing and rupture of the pipes, inclusive of pipes and fixtures, is $20,800. (Defs. Ex. V, Gotsis Report and Estimate, dated Dec. 23, 2005; see generally Tr. 187-90.) Mr. Gotsis estimated that the cost of replacing the floor, ceiling and entryway of the stateroom is $2,650, and replacing all of the sheet rock, insulation, and wood damaged as a result of the ruptured pipes is $9,300. (Tr. 198.) Mr. Gotsis also estimated that the cost of replacing the front roof and tongue-and-groove ceiling was $6,880, but acknowledged that $1,700 should be deducted from this estimate because the front roof had been repaired, leaving $5,150 as the estimated cost of repairing the tongue-and-groove ceiling. (Tr. 189-90.) Plaintiff has not presented any evidence to rebut Mr. Gotsis's estimate. The Court finds that the future cost of repairing the damage caused by the ruptured piping and water damage totals $37,930.

## C.    **Towage and Storage**

Defendants contend that, relying on Mr. Muller's statement that the vessel would be repaired by the spring of 2005, defendants entered into an agreement with the Gateway

Marina in Brooklyn, NY, to rent a slip for the vessel. (Tr. 92-93, 121; Defs. Ex. N.) Ms. Fischer testified that defendants paid $6,365 to the marina for moorage of the vessel, for the period of April 15, 2005 through October 15, 2005, which was unused because the vessel was not fit for habitation and because the vessel remained in plaintiff's custody through the summer of 2005. (Tr. 92-93.) Ms. Fischer also testified that when the vessel was removed from plaintiff's shipyard, the vessel was towed to Kings Plaza Marina in Brooklyn, NY. (Tr. 91-92; see also Defs. Ex. L, All Season Marine, Invoice for $300, dated Aug. 30, 2005.) Ms. Fischer testified that, as of the date of her testimony, the vessel remained at the Kings Plaza Marina, at a cost of $500 per month, totaling $3,500 as of March 2006.

The Court finds that the parties had not reached an agreement regarding the date by which the repairs to the vessel would be completed, or that plaintiff was otherwise aware that defendants would detrimentally rely on any representation regarding the date of completion of the repairs. Other than Mr. Fischer's testimony regarding Mr. Muller's statement that the repairs would be completed by spring 2005, there is no evidence that the parties reached an agreement regarding a completion date. Moreover, there is no evidence that plaintiff was advised that defendants intended to rent a slip for the vessel in reliance on plaintiff's statement that the repairs would be

completed by spring 2005.

## D.  Undisputed Charges

The records reflects that the quality of workmanship of certain repairs is uncontested.  Mr. Lesser testified that the patching of a hole in the hull of the vessel where a U-bracket had been pulled out, apparently when the vessel was transported to plaintiff's shipyard, "had been done well . . . ."  (Tr. 129.) Similarly, although defendants question the time expended performing certain repairs and tasks, defendants do not contend that the repair of a worn corner on the starboard bow, the blocking, hauling and launching the vessel, the cleaning of the bottom of the vessel, the caulking of the sides and interior of the vessel, or the cleaning the vessel's interior, were performed in an unworkmanlike manner.  The total charges pertaining to work for which the quality of workmanship is uncontested is $10,556. (See generally Invoice.)

## III.  CONCLUSIONS OF LAW

This Court has subject matter jurisdiction pursuant to its Admiralty and Maritime Jurisdiction under Rule 9(h) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1333.  See Booth Steamship Co. v. Meier & Oelhaf Co., 262 F.2d 310, 312 (2d Cir. 1958) ("contracts for the repair of vessels are maritime

contracts"); <u>Robert E. Derecktor, Inc. v. Norkin</u>, 820 F. Supp. 791, 792-93 (S.D.N.Y. 1993) (federal courts have subject matter jurisdiction over cases arising out of claim for failure to pay for repairs to a vessel, and counterclaims for overcharges).

The Court also has jurisdiction over the vessel and defendants Lesser and Fischer. "To exercise *in rem* jurisdiction over a *res*, the court must have the *res* within its jurisdiction." <u>R.M.S. Titanic, Inc. v. The Wrecked and Abandoned Vessel</u>, 435 F.3d 521, 529 (4th Cir. 2006) (citations omitted); <u>see also</u> <u>Ferrostaal, Inc. v. HACI HASSAN YARDIM</u>, No. 03-CV-4886, 2006 WL 2819585, at *3-4 (S.D.N.Y. Sept. 29, 2006). It is undisputed that the *res*, the vessel, is located within the Eastern District of New York. (<u>See</u> Tr. 91-93; <u>see also</u> Doc. No. 2, Warrant for arrest of the vessel commanding defendants Lesser and Fischer to keep the vessel at Kings Plaza Marina, 2565 Flatbush Avenue, [Brooklyn, NY], Dock C.) In addition, the Court has jurisdiction over defendants Lesser and Fischer because, by failing to challenge personal jurisdiction, they have waived any such objection. <u>See</u> Fed. R. Civ. P. 12(h).

Venue is also proper in the Eastern District of New York. In admiralty and maritime actions, venue lies in any district in which valid service of process could have been made on the defendant. <u>Hatfield v. Asphalt Int'l, Inc.</u>, No. 03 Civ. 1372, 2004 WL 287680, at *5 (S.D.N.Y. Feb. 11, 2004) (citing

Gipromer v. SS Tempo, 487 F. Supp. 631, 633 (S.D.N.Y. 1980).
Here, the Court determines that valid service of process was or
could have been made in the Eastern District of New York, and
thus concludes that venue lies in this District.

**A.  Plaintiff's Claim**

As a preliminary matter, the Court notes that plaintiff
has not articulated a theory of liability in its pleading.
Plaintiff alleges that it furnished supplies and repairs to the
vessel upon the orders of the owners of the vessel, defendants
Fischer and Lesser, for which defendants did not pay.  (JPO ¶
4(a).)  In the parties' Joint Pretrial Order, as well as the
Complaint, plaintiff requests judgment in the amount of the
unpaid invoice, $35,778.73, and "[t]hat the 52' House Barge be
sold at a judicial sale to satisfy any judgment issued . . . ."
(Compl., Ad damnum clause.)

Plaintiff's post-trial brief, dated April 25, 2006,
alleges, for the first time, the existence of a "contract" to
repair the vessel.  (Doc. No. 18, Plaintiff's Proposed Findings
of Fact and Conclusions of Law ("Pl. Post-trial Br.") at 5.)
Specifically, plaintiff claims that the "terms of the contract to
repair the vessel changed from an estimated lump sum agreement to
do specified work (for between $20,000 and $22,000) to a time
($60/hr) and materials (at cost) agreement to effect hull and

topside repairs." (<u>Id.</u>)  Plaintiff further claims that "[a]n agreement to perform work and services which are to be completed in less than one year need not be in writing." (<u>Id.</u>)

The Court construes plaintiff's claim as one for breach of contract.  Accordingly, with respect to plaintiff's claim, the Court must determine whether a contract existed, the terms of that contract, and whether the contract was breached.[5]

## 1.  Breach of Contract Claim

In general, maritime law recognizes and enforces oral contracts.  <u>See, e.g.</u>, <u>American Dredging Co. v. Miller</u>, 510 U.S. 443, 451 (1994); <u>Great Circle Lines, Ltd. v. Matheson & Co., Ltd.</u>, 681 F.2d 121, 124 (2d Cir. 1982) ("[t]he binding effect of oral contracts in maritime law is an ancient concept whose roots

---

[5] Although not specifically alleged, plaintiff may also have a claim for a maritime lien pursuant to the Maritime Commercial Instruments and Liens Act, 46 U.S.C. § 31301, *et seq.*, (formerly the Federal Maritime Lien Act), but such a claim was not pleaded. Plaintiff's submissions, and Mr. Muller's testimony, refer to defendants' act of removing the vessel from plaintiff's custody and control without plaintiff's consent.  (<u>See, e.g.</u>, Pl. Post-trial Br. at 5.)  Mr. Muller states that defendants' removal of the vessel divested plaintiff of a security interest in the vessel.  (Tr. 209-10.)  This is incorrect.  A maritime lien "arises when the debt arises, and grants the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds."  <u>Equilease Corp. v. M/V SAMPSON</u>, 793 F.2d 598, 602 (5th Cir. 1986) (citation omitted).  "This lien always follows the vessel when it is sold and remains enforceable against the vessel in rem."  <u>St. Paul Fire and Marine Ins. Co. v. Chau Van Kha</u>, No. 05-CV-5059, 2006 WL 2513422, at *3 (E.D. La. Aug. 28, 2006) (citing <u>Equilease Corp.</u>, 793 F.2d at 602).

are deeply embedded in custom") (citing <u>Kossick v. United Fruit Co.</u>, 365 U.S. 731, 734 (1961)).  In addition, courts have held that contracts to repair vessels are directly maritime in nature and invoke admiralty jurisdiction.  <u>See, e.g.</u>, <u>New Bedford Dry Dock Co. v. Purdy</u>, 258 U.S. 96, 99 (stating that a contract for repairs or supplies of a vessel is maritime); <u>Constructive Hands, Inc. v. Baker</u>, No. 04-CV-939, 2006 WL 2270376, at *2 (N.D.N.Y. Aug. 8, 2006).  To form a binding contract, the parties must have agreed "on all material terms of a contract and clearly express their intention to be bound by those terms."  <u>May Ship Repair Contr. Corp. v. Barge Columbia New York</u>, 160 F. Supp. 2d 594, 597 (S.D.N.Y. 2001) (citing <u>Orient Mid-East Lines v. Albert E. Bowen, Inc.</u>, 458 F.2d 572, 574 (2d Cir. 1972)).

As stated above, the record reflects that on November 1, 2004, defendants contacted Mr. Muller to discuss the estimated cost of repairing the vessel in accordance with the Olsen survey. (Tr. 73-74.)  Defendants informed Mr. Muller that they had limited funds to repair the vessel, that Mr. Muller's estimate should include unforeseen problems and that defendants would not purchase the vessel if the cost of repairs was beyond their budget.  (Tr 74-75.)  Thus, Mr. Muller knew that defendants would rely on his estimate in deciding whether to purchase and hire plaintiff to repair the vessel.  On November 10, 2004, having reviewed the Olsen survey and inspected the vessel, Mr. Muller

estimated the cost of the repairs between $20,000 and $22,000.
(Tr. 10, 75-76; Defs. Ex. D, Handwritten notes of James Muller
dated Nov. 10, 2004.)  Mr. Muller's handwritten notes correspond
to the repairs noted in the Olsen survey.  The final page of Mr.
Muller's notes, entitled "Master Sheet," enumerates each repair,
and lists the estimated cost of that repair.  The estimate totals
$21,700.75, and was conveyed to defendants, although no written
estimate was ever provided to defendants.  (Tr. 79-80.)

Following the defendants' receipt of the plaintiff's
estimate, and defendants' subsequent purchase of the vessel in
reliance on this estimate, defendants retained and directed
plaintiff to commence repairs on the vessel as discussed,
consistent with the Olsen survey.  The only notation in
plaintiff's Master Sheet regarding roof repairs totaled $975 for
repairing the cracked patch above the staircase, as noted in the
Olsen survey.

Plaintiff contends that the terms of the agreement
changed once the vessel was hauled to plaintiff's shipyard and
re-inspected.  Specifically, plaintiff contends that:

> [the] estimate to perform work recommended by Olsen
> based upon Muller's cursory viewing of the [vessel] . .
> . was superceded by the actual condition of the
> [vessel] . . . .  The terms of the contract to repair
> the vessel changed from an estimated lump sum agreement
> to do specified work (for between $20,000 and $22,000)
> to a time ($60/hr) and materials (at cost) agreement to
> effect hull and topside repairs.

(Pl. Post-Trial Br. at 5.)  Plaintiff claims that defendants

entered into a binding oral contract with plaintiff for repairs and services to be performed on the vessel, at a rate of $60 per hour, plus the cost of materials. Therefore, plaintiff claims, defendants are obliged to make payment to plaintiff in the amount listed on the invoice.

The record lacks evidence to support plaintiff's position. Given that the Court has found that the parties did not agree that plaintiff would charge $60 per hour for labor, the Court finds that the parties did not agree "on all material terms of [an hourly] contract and clearly express their intention to be bound by those terms." See May Ship Repair, 160 F. Supp. 2d at 597 (citation omitted). Instead, the Court finds that the parties had a binding oral contract that plaintiff would perform the repairs set forth in the Olsen survey, and that defendants would compensate plaintiff in the amount of the agreed-upon estimate. The Court further finds that Mr. Muller, as the president forty percent shareholder of the plaintiff corporation, had authority to, and did bind plaintiff to an oral contract with defendants. The Court also finds that plaintiff materially breached its obligations under this contract by not performing most of the agree-upon repairs, thereby excusing defendants from performance of their obligation under the contract to compensate plaintiff for services not performed. See New Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F.3d 101, 117 (2d Cir. 2006)

(material breach of a contract may excuse non-breaching party from performance) (citations omitted); 23 Williston on Contracts § 63:3, at 438-39 (4th ed. 2002).

Plaintiff's contention, that the "terms of the contract to repair the vessel changed" upon plaintiff's further re-inspection of the vessel (Pl. Post-Trial Br. at 5), supports the Court's conclusion that the only binding oral contract between the parties was the contract for the estimated amount of $21,700.75 to perform the repairs set forth in the Olsen survey. The evidence demonstrates that although defendants asked plaintiff for interim bills to determine what was owed at various points, plaintiff never provided a bill or any other documentation, particularly one that recalculated the initial estimate in light of the alleged "change" in the terms of the agreement. (See Tr. 119.) The understanding of and appreciation for any change in the material terms of the contract for repairs was purely unilateral on the part of plaintiff, and never communicated to defendants. (Tr. 119.)

## 2.   *Quantum Meruit*

Having concluded that plaintiff failed to prove the existence of a valid hourly contract for the services it actually performed, as opposed to the estimated services contract between the parties, the Court considers whether plaintiff is entitled to

be reasonably compensated for services rendered on the vessel under the theory of *quantum meruit*. See R.B. Ventures, Ltd., v. Simon R. Shane, 112 F.3d 54, 60 (2d Cir. 1997) (*quantum meruit* claims are "non-contractual, equitable remedies that are inapplicable if there is an enforceable contract governing the subject matter."); see also Peninsular & Oriental Steam Navigation Co. v. Overseas Oil Carriers, Inc., 553 F.2d 830, 835 (2d Cir. 1977) ("[T]he law is clear that quasi-contractual claims may be considered by the federal courts in admiralty if they arise out of maritime contracts, or other inherently maritime transactions.") (citations and footnote omitted); GMD Shipyard Corp. v. M/V ANTHEA Y, No. 03 Civ. 2748, 2004 WL 2251670, at *7 (S.D.N.Y. Oct. 6, 2004).

The Court examines whether plaintiff is entitled to be compensated for services rendered on the vessel under the theory of *quantum meruit*, under New York law. "[C]ourts applying maritime law may adopt state law by express or implied reference or by virtue of the interstitial nature of federal law." GMD Shipyard, 2004 WL 2251670, at *7 (quoting Palestina v. Fernandez, 701 F.2d 438, 439 (5th Cir. 1983)); see also Integrated Control Sys. Corp. v. Consolidated Edison Co. of New York, 990 F. Supp. 295, 298 (S.D.N.Y. 1998) (considering a third-party defendant's *quantum meruit* counterclaim under New York law where the plaintiffs had invoked admiralty jurisdiction).

"In order to make out a cause of action in *quantum meruit* . . ., a plaintiff must establish (1) the performance of services in good faith; (2) the acceptance of those services by the person to whom they are rendered; (3) an expectation of compensation therefor; and (4) the reasonable value of the services." <u>GMD Shipyard</u>, 2004 WL 2251670, at *7 (quoting <u>Landcom, Inc. v. Galen-Lyons Joint Landfill Comm'n</u>, 687 N.Y.S.2d 841, 842 (4th Dep't 1999)); <u>LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham</u>, 185 F.3d 61, 66 (2d Cir. 1999) (citations omitted).

With respect to the first element, the evidence presented at trial demonstrates that plaintiff performed labor and used materials in good faith. Notably, "the concept of 'good faith,' under New York law, 'is an intangible and abstract quality with no technical meaning or statutory definition.'" <u>Realuyo v. Diaz</u>, No. 98-CV-7684, 2006 WL 695683, at *7 (S.D.N.Y. Mar. 17, 2006) (quoting <u>Doyle v. Gordon</u>, 158 N.Y.S.2d 248, 259 (N.Y. Sup. Ct. 1954)). "It encompasses, among other things, . . . the absence of a design to defraud or to seek an unconscionable advantage." <u>Id.</u> (citing <u>Doyle</u> at 158 N.Y.S.2d at 259-60). Here, although defendants allege that the amount of plaintiff's invoice is "grossly excessive," the evidence does not support a finding that plaintiff engaged in fraudulent or unconscionable conduct in performing repairs on the vessel. Instead, the evidence

regarding plaintiff's billing practices bears on the fourth factor in the *quantum meruit* analysis – the reasonable value of the services.

With respect to the second element – the acceptance of the services by the person to whom they are rendered – the evidence demonstrates that, while plaintiff materially breached the oral contract with respect to certain repairs which it was obligated to perform, defendants received some benefit from the services plaintiff did perform. Additionally, defendants accepted plaintiff's services for certain repairs, including repairs not identified in the Olsen survey, namely repairs to the hull which had apparently been damaged during the hauling of the vessel to plaintiff's shipyard. (see Tr. 99-100, 103-105; Invoice at 12/23 and 12/30/04.) However, contrary to plaintiff's contention that defendants never complained about the quality or cost of the plaintiff's services (see Pl. Post-trial Br. at 4; Tr. 26), the Court finds that defendants complained that the forward roof still leaked after plaintiff had completed work on the roof (see Tr. 98, 112-13, 118), and that the invoice was excessive (see Tr. 129-30). Defendants also complained that after plaintiff painted the bottom of the vessel, some of the paint came off. (Tr. 20.) The bottom of the vessel was subsequently repainted. (Tr. 20-21.) Nevertheless, because defendants expected that the repairs indicated in the Olsen

survey would be completed by plaintiff, and because defendants were benefitted by certain services not identified in the Olsen survey but completed by plaintiff, the Court finds that this element is satisfied.

Regarding the third factor, plaintiff expected compensation for services, as evidenced by its written estimate and ultimate issuance of an invoice for the value of the labor performed and materials used. Indeed, defendants acknowledge that they did not believe plaintiff's services would be free of charge and that plaintiff "deserved to be paid something." (See Tr. 129.) One exception is a charge for an additional $2,655.18 for storage and electricity from May 11, 2005 through August 30, 2005, despite testimony that plaintiff allowed defendants to use plaintiff's dock and electricity after defendants' contractor was hired at plaintiff's direction. (See Defs. Ex. G; Tr. 200-01.)

The Court finds that the storage and electrical charges are not compensable because there is no evidence that plaintiff expected compensation for storage and electricity. Rather, Mr. Muller testified that he did not originally intend to charge defendants for storage and electricity, and that it was only after defendants removed the vessel from the shipyard without paying that he decided to charge for these items. (Tr. 200-01, 204-05.) The Court finds that plaintiff is entitled to some measure of recovery in *quantum meruit*. Equity demands that

plaintiff be permitted to recover the reasonable value of its unpaid labor and materials. Thus, the question that remains is the amount to which plaintiff is entitled.

Plaintiff seeks to recover $35,778.73, the total amount of the unpaid invoice. The evidence and above-stated findings of fact and conclusions of law, however, militate against the full recovery of this amount by plaintiff. The Court determines that with respect to the $13,440 charged for labor in connection with repairing the roof above the stateroom, plaintiff's labor charges were largely of plaintiff's own creation. The record demonstrates that when removing the fiberglass coating from the roof, plaintiff's employees discovered rotten wood underneath the fiberglass coating, and removed this rotten wood piece by piece. (See Tr. 38; see also Invoice entries at 12/22/04, 12/28/04, and 12/29/04.) Plaintiff's piecemeal removal of the rotten wood, as opposed to determining, at the outset, the damaged portion and removing or restoring that portion, caused significant inefficiencies, for which plaintiff should not be compensated. (See Tr. 170.)

In any event, based on the evidence, the Court finds that despite plaintiff's efforts at repairing the roof, the roof still leaked (Tr. 98) and remained unstable in some areas (Tr. 145). Indeed, the evidence established that defendants were forced to retain a carpenter, at a cost of nearly $3,000, to

resheath the roof above the stateroom due to plaintiff's failed attempt at repairing the same. (<u>See</u> Tr. 85-86; 145-48.) Accordingly, defendants will not be required to compensate plaintiff for the $13,440 charged for labor in connection the roof above the stateroom.

With the exception of the $13,440 charged for labor in connection with the failed roof repair, plaintiff is entitled to the reasonable value of some of its other services for work performed on the vessel. Specifically, plaintiff's invoice reflects that in addition to the work performed on the roof, plaintiff charged for:

1.  blocking, hauling, and launching the vessel, at a cost of $4,376 (Invoice entry at 12/14/05, 12/21/05, 12/30/04, 2/14/05 and 4/28/05);

2.  cleaning the bottom of the vessel, at a cost of $2,340 (<u>id.</u> at 12/14/04, 12/21/04, and 12/30/04);

3.  painting the bottom of the vessel, at a cost of $3,990 (<u>id.</u> at 12/22/04, 12/29/04, 12/30/04 and 4/28/05);

4.  repairing a hole on the starboard aft side of the vessel where a U-bracket had pulled out of the hull, at a cost of $480 (<u>Id.</u> at 12/30/04);

5.  caulking the sides of the vessel, at a cost of $1,260 (<u>id.</u> at 12/22/04, 12/23/04, and 12/28/04);

6.  caulking the edges around the sauna room, at a cost of $240 (<u>id.</u> at 2/16/05);

7.  repairing a worn corner on the starboard bow, at a cost of $480 (<u>id.</u> at 12/22/04 entry); and

8.  cleaning the interior of the vessel and cleaning and pumping the bilge of the vessel, at a cost of

$1,380 (<u>id.</u> at 12/23/04, 1/3/05, 1/4/05, and 2/15/05).

The above-listed items total $14,546.

At trial, defendants presented the testimony of Michael Kurnides, an expert marine surveyor, accepted as such by the Court without objection from plaintiff, who questioned the accuracy of plaintiff's billing practices.  Based on a review of plaintiff's invoice, Mr. Kurnides determined that plaintiff generally claimed more hours of labor than Mr. Kurnides believed were necessary to complete the work.  (<u>See generally</u> Tr. 167-177; Defs. Ex. T, Report of Michael Kurnides dated Oct. 15, 2005 ("Kurnides Report").)

The Court finds that Mr. Kurnides's testimony regarding plaintiff's billing practices is unpersuasive.  Mr. Kurnides opines in hindsight, acknowledging that he had not viewed or inspected the vessel's condition at the time of its purchase. (Tr. 176.)  Mr. Kurnides first viewed the vessel after it had been worked on by plaintiff and defendants' contractor.  (Tr. 176.)  Further, Mr. Kurnides did not view or inspect the vessel out of the water, to enable inspection of the bottom.  (Tr. 176-177.)  Thus, Mr. Kurnides's opinion regarding the time necessary to paint the bottom of the vessel assumed that the bottom was clean and dry, and did not include the time expended for scraping and cleaning.  Moreover, Mr. Kurnides was unable to assess the degree of difficulty of the repairs, and based his opinion solely

-33-

on the plaintiff's invoice as compared to market rates for
certain kinds of repair services.  Accordingly, Mr. Kurnides's
testimony is not helpful to resolving whether, and to what
extent, plaintiff's invoice contains inflated or questionable
billing entries.  Without any other expert testimony on this
point, the Court cannot speculate as to the accuracy or
inaccuracy of plaintiff's invoice, and thus, finds that, with the
exception of the $13,440 charged for the roof and the $2,655.18
separately charged for storage and electricity, plaintiff is
otherwise entitled to recover the balance of the invoice, for a
total award of $17,127.40, calculated as follows:

| Service | Invoice Entry | Cost |
|---------|---------------|------|
| Blocking, hauling, and launching | 12/14/05, 12/21/05, 12/30/04, 2/14/05 and 4/28/05 | $4,376.00 |
| Cleaning bottom of vessel | 12/14/04, 12/21/04, and 12/30/04 | $2,340.00 |
| Painting the bottom of the vessel | 12/22/04, 12/29/04, 12/30/04 and 4/28/05 | $3,990.00 |
| Repairing a hole where a U-bracket had pulled out of the hull | 12/30/04 | $480.00 |
| Caulking the sides of the vessel | 12/22/04, 12/23/04, and 12/28/04 | $1,260.00 |
| Caulking around the sauna room | 2/16/05 | $240.00 |
| Repairing a worn corner on the starboard bow | 12/22/04 | $480.00 |

| Cleaning the interior of the vessel and cleaning and pumping the bilge | 12/23/04, 1/3/05, 1/4/05, and 2/15/05 | $1,380.00 |
|---|---|---|
| Materials | | $1,257.83 |
| *Subtotal* | | *$15,803.83* |
| Sales tax at 8.375% | | $1,323.57 |
| **TOTAL** | | **$17,127.40** |

## B.  Defendants' Counterclaim

Defendants seek to recover $81,869.29 in damages from plaintiff either in contract, on the theory that plaintiff breached its implied warranty of workmanlike performance, or in tort, on the theory that plaintiff was negligent in its repair and custody of the vessel.  (See generally JPO ¶ 4(b); Doc. No. 17, Defendants' Proposed Findings of Fact and Conclusions of Law ("Defs. Post-trial Br.") 36-7; Statement of Damages.) Specifically, defendants allege that the plaintiff breached its implied warranty of workmanlike performance on the oral contract by failing to repair the roof above the stateroom, and by opening the roof and failing to cover the open roof during storms, thus permitting the interior of the vessel to be exposed to rain and snow while the roof was being repaired.  In addition, defendants allege that the failure of plaintiff to "winterize" the vessel's piping system "constituted a breach of warranty of workmanlike

performance, and negligence, for which [plaintiff] is liable . . . for losses and damages caused by such breach, and negligence." (Defs. Post-trial Br. at 42; see also (JPO ¶ 4(b).)

A ship repairer potentially faces three sources of liability for repairs it performs improperly on a vessel. First, it may be liable in contract for a breach of its expressly assumed obligations. Second, it may also be liable for a breach of an implied warranty of workmanlike performance that attaches to maritime and admiralty contracts. See Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124 (1956); Fairmont Shipping Corp. v. Chevron Int'l Oil Co., Inc., 511 F.2d 1252, 1260 (2d Cir. 1975). Third, "[a] ship repairer may also be liable for the maritime tort of negligence." La Esperanza de P.R., Inc. v. Perez y Cia. de Puerto Rico, Inc., 124 F.3d 10, 17 (1st Cir. 1997) (citing Alcoa S.S. Co. v. Charles Ferran & Co., 383 F.2d 46, 50 (5th Cir. 1967)); Todd Shipyards Corp. v. Turbine Serv., Inc., 674 F.2d 401, 412 (5th Cir. 1982).

Defendants' counterclaim alleges that plaintiff breached an implied warranty of workmanlike performance and that plaintiff was negligent in performing the work on the vessel.

## 1.   Breach of Implied Warranty and Negligence

General maritime law requires that a contractor perform repairs in a skilled and workmanlike manner. De Carli v.

Crusoe's Rivertown Motors, Inc., 68 F.3d 474, 1995 WL 620964, at

*4 (6th Cir. Oct. 19, 1995) (unpublished per curiam) (citing

Little Beaver Enter. v. Humphreys Ry., Inc., 719 F.2d 75, 77-78

(4th Cir. 1983)); Messina v. Ocean Repair Service Co., 86 Civ.

7898, 1993 WL 427443, at *4 (S.D.N.Y. Oct. 19, 1993); Union

Marine & Gen. Ins. Co. v. American Export Lines, Inc., 274 F.

Supp. 123, 128 (S.D.N.Y. 1966) (citations omitted).  "This

warranty need not be express to bind the ship repairer to use the

degree of diligence, attention and skill adequate to complete the

task."  See Coffman v. Hawkins & Hawkins Drilling Co., Inc., 594

F.2d 152 (5th Cir. 1979); Tebbs v. Baker-Whiteley Towing Co., 407

F.2d 1055 (4th Cir. 1969).  That an agreement to perform repairs

is oral is immaterial to the existence of an implied warranty of

workmanlike performance on the contract for repairs.  Booth

Steamship Co., 262 F.2d at 313.

The implied warranty of workmanlike performance has

consistently been applied to find fault where repair work is

improperly performed.  See, e.g., Booth Steamship Co., 262 F.2d

310; Rivera-Domenech, 254 F. Supp. 2d at 236.  "While the

warranty parallels a negligence standard, the owner of a vessel

may be entitled to recover for breach of the warranty even if the

repairs were performed without negligence."  Rivera-Domenech v.

Perez, 254 F. Supp. 2d 232, 236 (D. P.R. 2003) (citing La

Esperanza de Puerto Rico, Inc., 124 F.3d at 17).  Because the

warranty of workmanlike performance parallels a negligence standard, the Court will discuss defendants' claim of negligence within the context of the warranty of workmanlike performance.

As stated above, the Court has found that the parties had an binding oral agreement that plaintiff would perform the repairs set forth in the Olsen survey, and that defendants would compensate plaintiff in the amount of the agreed-upon estimate. The Court has also found that plaintiff materially breached this agreement by not completing the agreed-upon repairs. Although plaintiff may have performed some of the repairs in a workmanlike manner, the Court finds that plaintiff did not perform the repairs to the roof and to the heating and piping systems in a workmanlike manner, thereby breaching the contract's implied warranty of workmanlike performance.

The preponderance of the evidence establishes that plaintiff did not perform the roof repairs in a diligent, methodical or otherwise workmanlike manner. Plaintiff commenced the roof repairs on December 22, 2004 (see Invoice), by removing the roof's protective fiberglass coating, knowing that the cold weather would not allow him to use fiberglass to complete the repairs. (Tr. 23.) Instead of determining the extent of the rotten wood when plaintiff first commenced the repairs, plaintiff removed the rotten wood, as discovered, piece by piece. (Tr. 21-22.) This resulted in inefficiencies, for which defendants

should not be required to compensate plaintiff. Moreover, because the Court credited the testimony of Mr. Davey, indicating that the roof was still rotted, soft and unsafe to walk on after plaintiff's services with respect to the roof were completed (see Tr. 145), the Court finds that plaintiff breached its implied warranty to repair the roof in a workmanlike manner. Defendants were required to spend approximately $3,000 repairing the roof after plaintiff's failed efforts in repairing the same. Had plaintiff repaired the roof in a workmanlike manner, water would not have entered the vessel, causing extensive water damage to the vessel's ceiling, floors and walls, all of which required additional repairs. (See Tr. 89-91, 122; Defs. Exs. O, S1-S12.)

Turning next to defendants' negligence counterclaim, the evidence supports a finding that, despite the fact that plaintiff undisputedly opened the roof of the vessel and had notice of extensive precipitation entering the vessel during plaintiff's repairs, plaintiff did not adequately protect against the entry of water into the vessel. The plaintiff's tarpaulins were inadequate against the winter storms, and did not protect against snow and rain entering the vessel through the opening in the roof created by plaintiff. Plaintiff's failure to exercise reasonable care in repairing the roof and failing to prevent snow and rain from entering the vessel was the foreseeable and proximate cause of the pervasive water damage to the interior of

the vessel.

The Court also finds that although plaintiff undertook repairs of the vessel's heating and piping systems, plaintiff breached its implied warranty of workmanlike performance by not performing the agreed-upon repairs. Plaintiff, knowing that freezing weather in New York was likely during December through March and that pipes with water could freeze and rupture, negligently permitted the pipes in the vessel to do so. (Tr. 44.) The Court credits Mr. Gotsis's expert testimony that rupture of the pipes could have easily and inexpensively been prevented. The Court finds that, because plaintiff had undertaken repairs to the heating and piping systems (see Defs. Ex. D), plaintiff had a duty to perform those repairs in a workmanlike manner and exercise reasonable care. Plaintiff breached that duty by failing to take precautionary measures to prevent the pipes from freezing. Indeed, Mr. Muller testified that he did not advise defendants that the pipes could freeze and rupture, so that defendants could have taken preventative action if plaintiff was not willing to do so. (Tr. 44.)

**2.   Bailment**

The Court also notes that plaintiff would be liable for the damage caused to the vessel while in plaintiff's custody under a bailment theory. An action based on a bailment can be

-40-

raised either in contract or in tort. <u>Reel Therapy Charters,</u>

<u>Inc. v. Marina Mgmt., Inc.</u>, 02-CV-510, 2003 WL 23514559, at *6

(S.D. Fla. Dec. 31, 2003). A contract claim may be "based upon

breach of the bailment contract which incorporates a bailee's

implied duty of non-negligence (or of workmanlike performance)

with respect to the property while in its custody," and a tort

claim may be based in "simple negligence." <u>Id.</u>; <u>see also</u> <u>AXA Re</u>

<u>Property & Cas. Ins. Co. v. Tailwalker Marine, Inc.</u>, No.

04-1684-23, 2004 WL 3680276, at *3 (D. S.C. Dec. 17, 2004)

(citation omitted).

A contract for the storage or repair of a vessel

constitutes a bailment agreement. <u>See, e.g.</u>, <u>Snyder v. Four</u>

<u>Winds Sailboat Centre, Ltd.</u>, 701 F.2d 251, 252 (2d Cir. 1983);

<u>Hudson River Cruises, Inc. v. Bridgeport Drydock Corp.</u>, 892 F.

Supp. 380, 385 (D. Conn. 1994) (citation omitted); <u>see also</u>

<u>T.N.T. Marine Serv., Inc. v. Weaver Shipyards & Dry Docks, Inc.</u>,

702 F.2d 585, 588 (5th Cir. 1983) (holding that a bailment may

arise from an oral contract)). A bailment is "the delivery of

goods by their owner to another for a specific purpose, and the

acceptance of those goods by the other, with the express or

implied promise that the goods will be returned after the purpose

of the delivery has been fulfilled." <u>Goudy & Stevens, Inc. v.</u>

<u>Cable Marine, Inc.</u>, 924 F.2d 16, 18 (1st Cir. 1991).

Furthermore, "[a] failure by the bailee to exercise

that degree of care which is imposed upon him or her by reason of the nature of the bailment relationship is negligence such as will render the bailee liable to the bailor for any resulting injury or loss of the bailed property." Reel Therapy Charters, Inc., 2003 WL 23514559, at *6 (quoting 8A Am Jur.2d Bailments § 119 (1997)).

A bailor makes out a rebuttable presumption of negligence if the bailor proves that the bailed article was delivered in good condition and was returned damaged or not at all. See Gelb v. Minneford Yacht Yard, 108 F. Supp. 211, 214 (S.D.N.Y. 1952); Commercial Union Ins. Co. v. Bohemia River Associates, Ltd., 855 F. Supp. 802, 805 (D. Md. 1991) (citation omitted). In the context of a bailment, "no inference of negligence arises if the bailee's custody or possession of the vessel was not exclusive of that of the bailor; that is, the possession or control exercised by the bailor would permit the trier of fact to rationally conclude that the bailor (or both parties, equally) might be in the best position to explain what actually happened." Reel Therapy Charters, 2003 WL 23514559, at *7 (citations omitted); United States v. Mowbray's Floating Equip. Exchange, 601 F.2d 645, 647 (2d Cir. 1979).

Because the Court has found the existence of an oral agreement between the parties for plaintiff to take custody of the vessel and perform work on the vessel at plaintiff's shipyard

in accordance with the Olsen survey, the Court finds the existence of a bailment. The vessel was delivered by defendants to plaintiff for the specific purpose of repairing the vessel in accordance with the Olsen survey, the vessel was accepted by plaintiff, and there was an implied promise that the vessel would be returned to defendants upon completion of the repairs. See Goudy & Stevens, Inc., 924 F.2d at 18 (defining bailment).

Moreover, because the Court has found that the water damage observed by Mr. Gotsis and defendants occurred while the vessel was in plaintiff's exclusive custody, the Court finds that a presumption arises that plaintiff was negligent in its care of the vessel. In so concluding, the Court is mindful of the fact that, after the damage to the vessel from the open roof and ruptured pipes was sustained, defendants accessed the vessel while it was at plaintiff's shipyard. Nevertheless, the burden of production should be shifted to plaintiff because plaintiff's custody over the vessel was exclusive at the time the vessel was damaged and plaintiff, as the party contracted to perform repairs on the vessel's roof, heating and piping systems, among other things, was in the best position to prevent and explain the damage to the vessel, and had the duty to do so. By way of explanation, plaintiff merely contends that the vessel arrived at plaintiff's shipyard in an extensively damaged condition, which contention the record fails to support, and suggests that

plaintiff did not have a duty to prevent the pipes from freezing. Yet, plaintiff has failed to explain why the vessel was not in good condition, much less the same condition as at the time of delivery to plaintiff, after defendants regained custody of the vessel. There is no evidence that defendants or their contractor, who performed repairs after the damage to the vessel was sustained, caused damage to the vessel.

The Court concludes that plaintiff did not exercise due care in its control and custody of the vessel. The vessel, which did not arrive at plaintiff's shipyard in an extensively water damaged condition, was extensively damaged by exposure to water while in plaintiff's custody. The Court finds that plaintiff's failure to exercise due care and diligence in the repair of the roof caused the interior to be damaged by rain and snow. The Court also concludes that because the plaintiff undertook repairs to the heating and plumbing systems, and because plaintiff was aware that the water in the vessel's pipes would freeze during the winter months, plaintiff had a duty to prevent the pipes from freezing and rupturing. Accordingly, the Court will address the measure of damages to which defendants are entitled.

**3. Damages**

Defendants have incurred substantial expenses as a result of plaintiff's breach of its implied warranty of

workmanlike performance on the parties' oral agreement to complete the repairs set forth in the Olsen survey, and plaintiff's failure to exercise due care in its custody and control of the vessel. The Court has found that defendants expended $34,126.79 in labor and material costs repairing the roof, the damage caused by the entry of water into the vessel from plaintiff's failed roof repair, and the extensive water damage resulting from the ruptured pipes. (See Tr. 89-91, 94; Defs. Ex. O, Receipts.) In addition, based on the credible testimony and report of Mr. Gotsis, an expert in the field of general contracting, the Court has found that the estimated cost of removing and replacing the plumbing and heating systems and the water damaged interior is $37,930. (See Gotsis Report and Estimate; Tr. 187-90.) In view of the foregoing findings of fact and conclusions of law, defendants are entitled to recover for these damages, in the total amount of $72,056.79.

The Court declines to award defendants the costs of renting the unused slip at the Gateway Marina, the slip at the Kings Plaza Marina, or towage to Kings Plaza Marina. (See Tr. 92-93, 121; Defs. Ex. N, Gateway Marina Slip Agreement; Defs. Ex. L, All Season Marine Invoice.) The Court has found that the parties had not reached an agreement regarding the date by which the repairs to the vessel would be completed, or that plaintiff was otherwise aware that defendants would rely on any statement

-45-

regarding the date of completion of the repairs.  Thus, the Court

concludes that plaintiff could not have foreseen that it could be

liable for the slip rental and towage costs as a result of

breaching its purported agreement to timely repair the vessel in

accordance with the Olsen survey.  See Project Hope v. M/V IBN

SINA, No. 97-CV-3853, 2001 WL 1875854, at *2 (S.D.N.Y. July 17,

2001) ("Special damages" are "those that a contracting party did

not have reason to foresee as ordinary, natural consequences of a

breach when the contract was made . . . [and] are only

recoverable upon a showing that they were foreseeable and within

the contemplation of the parties at the time the contract was

made.") (internal quotation marks and citations omitted).

Accordingly, defendants' request for slip rental and towage costs

is denied.


**4.    Interest**

        Defendants also seek interest (see Answer at Prayer for

Relief clause; Defs. Post-trial Br. at 43), however, defendants

have failed to set forth any legal authority for their request,

or indicate the rate at, and date from, which they seek interest.

"[I]n admiralty cases prejudgment interest should be granted in

the absence of exceptional circumstances."  Magee v. U.S. Lines,

Inc., 976 F.2d 821, 823 (2d Cir. 1992) (citations and internal

quotation marks omitted).  "It is within the broad discretion of

the district court to determine the rate of interest and the date on which it commences." Independent Bulk Transp., Inc. v. Vessel "MORANIA ABACO", 676 F.2d 23, 27 (2d Cir. 1982); see also Transatlantic Marine Claims Agency, Inc. v. M/V OOCL Inspiration, 137 F.3d 94, 104 (2d Cir. 1998) (citation omitted).

The Court finds that there are no exceptional or extraordinary circumstances which militate against an award of prejudgment interest on defendants' claims, and thus defendants are entitled to recover prejudgment interest. The Court finds that prejudgment interest shall be calculated on the average yield of six-month Treasury bills from September 23, 2005, the date on which this action was commenced, through the date judgment is entered. See McCrann v. United States Lines, Inc., 803 F.2d 771, 774 (2d Cir. 1986) (approving award of prejudgment interest in admiralty case based on six-month Treasury bill rates); American Oil Trading, Inc. v. M/V SAVA, 47 F. Supp. 2d 348, 353 (E.D.N.Y. 1999) (applying prejudgment interest in admiralty case based on six-month Treasury bill rates); M. Prusman Ltd. v. M/V NATHANEL, 684 F.Supp. 372, 374 (S.D.N.Y. 1988) (same); New England Petroleum Co. v. O/T SONJA, 732 F. Supp. 1276, 1286 (S.D.N.Y. 1990). Defendants also shall be awarded post-judgment interest, calculated by the Clerk of Court at the rate prescribed by 28 U.S.C. § 1961, from the date judgment is entered.

**5.  Costs**

Defendants request costs (<u>see</u> Answer at Prayer for Relief clause; Defs. Post-trial Br. at 43), however, defendants have failed to document their costs.  The decision on taxation of costs is left solely to the discretion of the trial judge. <u>LoSacco v. City of Middletown</u>, 71 F.3d 88, 92 (2d Cir. 1995) (citing <u>Farmer v. Arabian Oil Co.</u>, 379 U.S. 227, 232-33 (1964)). The prevailing party has the burden of establishing that the taxation of costs is justified.  <u>John and Kathryn G v. Board of Educ. of Mount Vernon Pub. Sch.</u>, 891 F. Supp. 122, 123 (S.D.N.Y. 1995).  Defendants' request for costs is denied because defendants have failed to submit any evidence regarding their costs.

## IV.  CONCLUSION

For the foregoing reasons, plaintiff is awarded $17,127.40 in damages.  Defendants are awarded $72,056.79 in damages, without costs, plus prejudgment interest as calculated in accordance with this order, and post-judgment interest, calculated by the Clerk of Court at the rate prescribed by 28 U.S.C. § 1961.  The Clerk of the Court is directed to enter judgment accordingly, and to close this case.

**SO ORDERED.**
Dated:  October 6, 2006
          Brooklyn, NY

_____/s/_____
KIYO A. MATSUMOTO
United States Magistrate Judge